Exhibit A

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

Charles P. Steinberger and                          Case No. 8:10-bk-19945-KRM
Pamela J. Perry                                      Chapter 7

      Debtors.

_____/

Denise Subramaniam,                                 State of Oregon
                                                    Washington County Circuit Court
      Plaintiff,                                Civil Action No. C11-1899-CV

vs.

ICANN, Susan K. Woodward,                           Adv. No. 8:11-ap-_____-KRM
Charles Steinberger, and Internet.bs,

      Defendants.

_____/

## **NOTICE OF REMOVAL**

SUSAN K. WOODWARD, the Chapter 7 Trustee (the "**Trustee**") for the bankruptcy estate

of Charles P. Steinberger and Pamela J. Perry (the "**Debtors**"), by and through her undersigned

counsel, pursuant to Fed. R. Bankr. P. 9027, hereby gives notice of removal of the above-referenced

state court action, and respectfully states as follows:

    1.    The removed action is an action relating to an alleged Breach of Contract by the

Debtor and other parties, and the case was originally filed in the Circuit Court of Washington

County, State of Oregon, on or about March 31, 2011 (the "**State Court Action**").

    2.    The Debtors filed their voluntary petition for relief under Chapter 7 of the Bankruptcy

Code on August 19, 2010, Case No. 8:10-bk-19945-KRM, Middle District of Florida, Tampa

Division.

23

3. This Court has jurisdiction over the removed action pursuant to 28 U.S.C. § 1334.

4. The State Court Action may be removed to this Court pursuant to 28 U.S.C. 1452.

5. Allegations in the State Court Action concern an alleged breach of contract.

6. Upon removal of the cause of action, the proceeding is a core proceeding.

7. Trustee hereby consents to entry of final order(s) or judgment by this Court.

8. Copies of all available process and pleadings in the State Court Action, or as may be limited by the Court, will be supplemented soon hereafter.

> DONICA LAW FIRM, P.A.
> Counsel for Trustee
> 106 S. Tampania Ave., Suite 250
> Tampa, FL 33609
> Telephone: (813) 878-9790
> Facsimile: (813) 878-9746
> E-mail: herb@donicalaw.com
>
> /s/ Herbert R. Donica_____
> Herbert R. Donica, Esq.
> Florida Bar No. 841870

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Notice of Removal has been provided by regular U.S. Mail or the Court's CM/ECF system on the 26th day of April, 2011, to: **Charles F. Steinberger and Pamela J. Perry**, 19302 – 69th Avenue East, Bradenton, FL 34211; **Christopher D. Smith, Esq.**, 5391 Lakewood Ranch Blvd., #203, Sarasota, FL 34240; **Denise Subramaniam**, 2850 SW Cedar Hills Blvd. #351, Beaverton, OR 97005-1393; **ICANN**, c/o Samantha Eisner, Esq., Senior Counsel, 4676 Admiralty Way #330, Marina del Rey, California 90292 and **Internet.bs Corp.**, c/o Ernesto Gongora, CTO, 98 Hampshire Street, N-4892 Nassau, The Bahamas.

> /s/ Herbert R. Donica_____
> Herbert R. Donica, Esq.

24

Attachment 1
to Ex. A.

Exhibit A

*Copy for Charles Steinberger*

## IN THE CIRCUIT COURT OF THE STATE OF OREGON
### FOR THE COUNTY OF WASHINGTON

**C11-1899CV**

|  |  |
|---|---|
| | ) |
| | ) |
| Plaintiff: | )    Case No. _____ |
| Denise Subramaniam | ) |
| | )    PLAINTIF'S COMPLAINT |
| | )    BREACH OF CONTRACT |
| v. | )    SPECIFIC PERFORMANCE |
| Defendants: | )    $5,887,500 |
| ICANN, | ) |
| Susan K. Woodard, | ) |
| Charles Steinberger, | )    CLAIM NOT SUBJECT TO |
| Internet.bs | )    MANDATORY ARBITRATION |

---

### JURISDICTION AND VENUE

1. The Oregon Circuit Court has jurisdiction over this complaint and Washington County is an appropriate venue. The Plaintiff lives and does business in Washington County, Oregon.

2. Plaintiff is a disabled person. She is currently impoverished. Her poverty is a direct result of her disabilities and due to the defendants' breach of contract with her.

3. Plaintiff is a woman and sole proprietor of a very small technology business; Plaintiff's business qualifies as a federal Women-Owned Small Business (WOSB); an Oregon Women-Owned Enterprise (WOE) and an Oregon DBE (economically disadvantaged business enterprise.)

4. Due to these disadvantages, Plaintiff's business is at a much greater risk of failure when she incurs damage due to a breach of contractual obligations by a powerful monopolistic seller.

5. Plaintiff entered into contracts with the defendants as part of her business activities in Oregon. Plaintiff bought and registered domain names while in Oregon sold by the defendants as part of defendants' business activities in Oregon through the internet or World Wide Web (WWW).

6. Defendant Internet Corporation for Assigned Names and Numbers (ICANN) has a significant presence in and connection with Oregon, every Oregon government office, Oregon business, Oregon non-

---

profit or Oregon citizen with a website ultimately bought their domain name (i.e. the address for their website) from ICANN; and is a member of the public ICANN serves. All of these Oregon residents are wholly dependent on ICANN to perform on its contractual obligations and its expressed and implied warranties regarding its accredited registrars and its protection of public interest.

7.  An Internet business can be subject to jurisdiction for causing an injury in the state claiming jurisdiction. Courts have upheld that if someone uses the Internet to cause an injury in one state, the person causing the damage may be sued in the state where the injury occurred.

8.  A Pennsylvania court was able to obtain personal jurisdiction over a California Internet service provider that had 3,000 Pennsylvania subscribers. The act of processing the Pennsylvania applications and assigning passwords was sufficient to demonstrate the minimum contacts needed for personal jurisdiction. Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119 (W.D. Pa 1997).

9.  A Texas court gained personal jurisdiction over an out-of-state online gambling enterprise because the gambling operation entered into contracts with Texas residents to play online gambling games, sent emails to the Texas residents, and sent winnings to Texas residents. Thompson v. Handa-Lopez, Inc., 998 F. Supp. 738 (W.D. Tex. 1998).

10. Committing a tortious act over the Internet should bring about jurisdiction within the state at whose residents the tortious act was directed. The United States Supreme Court held in the 1984 case of Keeton v. Hustler Magazine, Inc. that a New Hampshire court properly exercised personal jurisdiction over an Ohio company in a libel suit on the grounds that New Hampshire maintained an interest in discouraging libel against its citizens.

11. The Supreme Court also held in the companion case Calder v. Jones that a California court could exercise personal jurisdiction over an author and an editor, both resident in Florida, for libeling a California resident in an article published in the NATIONAL INQUIRER.

12.  Furthermore, defendant ICANN is a multi-million dollar corporation incorporated in California with sole global authority over domain names required for all websites. ICANN has grievously harmed individuals similar to Plaintiff in the past through similar breach of contract and failure to perform on its contractual obligations as well as its stated responsibility to protect the public interest as a powerful monopoly. These similarly harmed individuals brought a class action against ICANN, (Martinez v. RegisterFly et al), but ICANN has never been legally held accountable for its gross misconduct and negligence and the damages it has caused to thousands of plaintiffs in earlier cases because ICANN claims jurisdiction in California Superior Court.

13.  In numerous complaints filed against ICANN the California Superior Court has consistently ruled in favor of ICANN. The lone exception was where the plaintiff was another multi-million dollar corporation.

14.  The California Superior Court appears to be biased in favor of ICCAN; and ICANN appears to have wielded undue influence over the California courts.

15.  Therefore any motion ICANN may make to move jurisdiction and venue to a California court would be highly prejudicial and discriminatory toward the Plaintiff if granted. Such an action would also result in the Plaintiff being denied her right to due process under the U.S. Constitution. (U.S. Const. amend. XIV, sec. 1)

16.  Plaintiff is forced to represent herself pro se due to her poverty. This places a considerable disadvantage on her. Jurisdiction or venue in any other court would cause Plaintiff severe hardship and would result in further damages and discrimination against her as a disabled person and as a poor person.

17.  Plaintiff has attempted to the best of her abilities to research the appropriate laws and legal procedure, but finds it difficult to understand the material provided by the Washington County Law

Library and is uncertain if she correctly referenced the laws pertaining to her claim in this complaint or followed all the proper procedures. Therefore Plaintiff prays the court will not disqualify or otherwise discriminate against her claims due to her lack of legal expertise and experience.

18. Plaintiff prays that should an attorney come forward at a future date after the filing of this complaint willing to take her case on contingency; that the court shall in no way bar or otherwise prejudice such attorney from modifying or amending or otherwise altering Plaintiff's complaint to correct errors and/or omissions she may have made through ignorance of law, legal procedure, legal process, legal writing or other requirements that would be known and understood by a trained educated legal professional.

### CLAIM FOR RELIEF OF DAMAGES DUE TO BREACH UNDER ORS §72.1010 et seq.

19. In 2003 Plaintiff contracted as a domain name reseller or third party domain registrar with a now insolvent incorporation, 4Domains Inc., owned by defendant Charles Steinberger. Plaintiff's reseller contract allowed her to buy domain name registrations wholesale and resell them to her business clients.

20. 4Domains Inc. contracted with ICANN to sell domain names on behalf of ICANN as an ICANN accredited registrar.

21. ICANN is a monopoly. ICANN is the sole authority over domain name registrations worldwide.

22. Internet.bs is an ICANN accredited registrar that was given the Plaintiff's domain registration reseller account and domain registration data by ICANN after ICANN determined 4Domains was insolvent.

23. Plaintiff and her clients are "buyers" and ICANN, 4Domains, and Internet.bs are each a "seller" as defined by ORS §72.8010: Definitions for ORS §72.8010 to §72.8200.

24. The Plaintiff and defendants entered into legally binding contracts with each other regulated by ORS §72.8010 et seq.

25. Because ICANN is a monopoly any business or individual desiring to purchase a domain name for the purpose of establishing and operating a website has no choice but to buy and register domain names from one of ICANN's accredited registrars.

26. ICANN makes specific public claims regarding its accreditation policy and the allowable use of the term "ICANN accredited registrar." These claims constitute express and implied warranties regarding performance expectations for ICANN and its accredited registrars; as per ORS §72.8010 to §72.8200.

27. ICANN started out as a "government sanctioned" monopoly; then became an unregulated monopoly in recent years. Due to ICANN's monopolistic nature, public interest demands a higher than normal standard of performance for ICANN in its:

    (a.)   contractual obligations;

    (b.)   stated duties to the public;

    (c.)   legal obligation to provide transparency to the public regarding its activities; and

    (d.)   its stated role to protect fairness, competition and free enterprise on the internet or WWW.

28. Furthermore, due to ICANN's status as a monopoly with tremendous public responsibility to ensure fairness over the internet, its contractual obligations with its accredited registrars are not contractual obligations purely between ICANN and its individual accredited registrars, but also between ICANN and third party registrars that are fully dependant on the validity of ICANN's accreditation practices, policies and actions; and between ICANN and the general public who are also fully dependent on ICANN to uphold its contractual obligations.

29. ICANN's contract with its accredited registrars, titled Registrar Accreditation Agreement and ICANN's Statement of Registrar Accreditation Policy, both available on ICANN's website, and attached to this complaint as EXHIBIT A and EXHIBIT B respectively, state that minimum requirements for a registrar to obtain ICANN accreditation include:

(a.)  Financial solvency;

(b.)  The ability to maintain robust software adequate to manage third party domain name registrations;

(c.)  The ability to provide adequate technical and customer support;

(d.)  An active commercial insurance policy adequate to provide relief for damages caused when an ICANN accredited registrar fails to perform its expected duties or otherwise causes damages to third parties while accredited by ICANN;

(e.)  Assurance that that the registrar's obligations to its customers and to the registry administrator will be fulfilled in the event that the ICANN accredited registrar goes out of business.

30.  In addition, ICANN's contract with its accredited registrars requires ongoing compliance with ICANN's requirements for accreditation; and requires registrars to inform ICANN of insolvency so that ICANN can transfer its domain registration data to another ICANN accredited registrar to prevent damages to third parties (i.e. resellers or third party registrars and individual domain name owners like the Plaintiff and her clients.)

31.  Defendant Charles Steinberger did not inform ICANN of 4Domain's insolvency prior to filing bankruptcy; and thereby breached his contract with ICANN. Charles Steinberger knew or should have known the risk of damage his breach would cause 4Domains' third party registrars, like the Plaintiff.

32.  Defendant Charles Steinberger did not keep active a commercial insurance policy adequate to provide relief for such damages; and thereby further breached his contract with ICANN.

33.  Plaintiff's damages would have been completely avoided had the defendant Charles Steinberger informed ICANN of 4Domains' insolvency prior to his filing bankruptcy.

34.  Furthermore, Plaintiff learned from defendant Charles Steinberger's bankruptcy attorney, Christopher D Smith, Smith & Dine, P.A., 5391 Lakewood Ranch Blvd, Suite 203, Sarasota, FL 34240,

that a tentative buyer for 4Domains existed; the deal fell through and the Bankruptcy Trustee, Susan K. Woodard, PO Box 7828, St. Petersburg, FL 33734–7828 decided to terminate the business operations and liquidate the assets of 4Domains Inc.

35.  Defendant Susan K. Woodard liquidated assets that did not belong to 4Domains Inc. or to Charles Steinberger; therefore she had no legal right to do so. According to Charles Steinberger's bankruptcy attorney defendant Susan K. Woodard was warned that her action would harm innocent third parties like the Plaintiff.

36.  Therefore Plaintiff has a right to compensation for damages from defendant Charles Steinberger pursuant ORS §72.7140, §72.7150, §72.7160 et al.

37.  Defendant Charles Steinberger's bankruptcy does not bar the Plaintiff's claim against his personal property and future earnings to compensate for damages he caused because:

     (a.)  his bankruptcy directly caused the Plaintiff's damages;

     (b.)  he simply had to inform ICANN of his company's insolvency prior to filing bankruptcy to prevent damage to the Plaintiff and her clients;

     (c.)  Charles Steinberger has a long history of irresponsible business practices; he needs to be held accountable for his actions so that in the future he might reconsider making decisions that will place other small businesses at risk for damages.

38.  Defendant Susan K. Woodard made a choice to liquidate assets in Charles Steinberger's bankruptcy that belonged to innocent third parties, including the Plaintiff;

39.  Therefore Plaintiff has a right to compensation for damages from defendant Susan K. Woodard pursuant ORS §72.7140, §72.7150, §72.7160 et al.

40.  Furthermore the circumstances surrounding the insolvency and eventual bankruptcy of 4Domains
     and ICANN's lax regulation of its accredited registrars pose a serious potential **threat to U.S. HOME**

     **LAND SECURITY** because:

     (a.)  ICANN's accreditation requirements also state that an ICANN accredited registrar must notify
           ICANN in the event of a transfer of business ownership.

     (b.)  ICANN was not notified that 4Domains was insolvent, nor that 4Domains was attempting to find
           a buyer for its insolvent business.

     (c.)  There is no reason to believe that any other ICANN accredited registrar would of its own accord
           behave differently than 4Domains has.

     (d.)  Any desperate ICANN accredited registrar in a position similar to 4Domains might sell its
           business to a terrorist group. Considering ICANN's lax validation policies regarding verification
           of compliance with its accreditation requirements, ICANN would be none the wiser, thus
           placing U.S. commerce at the mercy of a terrorist take down of websites owned by U.S. based
           companies.

41.  The circumstances stated above and the threats they pose are avoidable if ICANN performed due
     diligence to assure the ongoing compliance of its accredited registrars.

42.  Furthermore, ICANN chooses not to properly regulate compliance of its accredited registrars because
     this choice unduly enriches ICANN at the expense of Plaintiff and others like her. It costs ICANN less
     to fight occasional lawsuits brought against it for its failure to perform due diligence than to properly
     audit its accredited registrars for compliance; especially since ICANN has wielded undue influence on
     California courts and knows it will never lose a case or be held accountable for damages.

43.  ICANN's failure to uphold the obligations of its contract with the public and instead enrich itself
     results in considerable public harm. Economies are damaged when thousands of websites become

unavailable on the WWW due to ICANN's failure to properly regulate compliance of its accredited registrars; ICANN's choice to unduly enrich itself rather than perform its duty to the public creates a domino effect of small business failure and loss of jobs.

44. Plaintiff and the public has the right to adequate assurance of performance based on the contract(s) between the defendants and ICANN under ORS §72.6090.

45. Although Plaintiff's damages were initially caused by defendant Charles Steinberger's negligence and breach of contractual obligations with ICANN; those damages could still have been wholly prevented at least three months prior to Charles Steinberger's bankruptcy, and on multiple occasions thereafter, had ICANN acted reasonably and fulfilled its contractual obligations to Plaintiff and to the public with regard to its duty to verify compliance of its accredited registrars.

46. ICANN failed to perform due diligence and breached its contractual obligations to Plaintiff as a third party domain name registrar, a registered domain name owner, a commercial enterprise doing business over the internet and as a member of the general public.

47. Plaintiff has the right to adequate assurance of contractual performance and to performance based on express and implied warranties by ICANN under ORS §72.6090.

48. Defendant ICANN has a contractual obligation and responsibility to public interest to assure its accredited registrars meet requirements for ICANN accreditation to prevent damages like those suffered by the Plaintiff and her clients.

49. In **March 2010** Plaintiff filed a complaint with ICANN against 4Domains. Plaintiff's complaint stated that:

    (a.)  Reseller or third party registrar software provided by 4Domains for the purpose of renewing registered domain names failed. This failure prevented Plaintiff from renewing the domain

name lacurrencyexchange.com in behalf of her client, World Banknotes, a single proprietor minority owned very small business enterprise.

(b.)    Plaintiff logged numerous support tickets with 4Domains over a six week period. 4Domains support staff failed to respond to these requests in a timely and professional manner;

(c.)    Plaintiff was unable to reach 4Domains by phone as she had been able to do in the past;

(d.)    As a result, Plaintiff was unable to renew her client's registered domain name and it expired;

(e.)    As a result, Plaintiff's client's business website became unavailable on the WWW.

50.    A registered domain name is the address for a website. Take away the address for a website and customers and visitors can no longer find the website. Email can no longer be sent or received through the domain/website. The longer a website's address or domain name is unavailable the greater the damage to the website's owner.

51.    Plaintiff's primary business functions are website development, website and database hosting, and webmaster and SEO services. She offers domain name registration to as a courtesy service and does not make profit on the registration of domain names.

52.    However, registration of domain names is an essential part of Plaintiff's business. A registered domain name is a requirement for all websites, as such; it is a service she must offer to be competitive.

53.    Shortly after Plaintiff filed her **March 2010** complaint with ICANN against 4Domains she connected with Charles Steinberger through LinkedIn, an online social media network for professionals. Plaintiff asked this defendant to personally look into the problem and expedite the renewal of her client's expired domain name. This was done.

54. The domain name was expired for three days, so her client's website was unavailable to his customers and potential customers for three days. Plaintiff lost her client's account, and its revenue, as a result. She also must repay revenue received from this client.

55. In **March 2010** Plaintiff did not know or understand the contractual obligations of ICANN accreditation; nor did she understand the expressed and implied warranties inherent in these contracts and the other written documents pertaining to ICANN's responsibilities towards the public interest.

56. However, ICANN definitively knew the risks of noncompliance and the potential damage it could cause to third party domain registrars and domain name owners, like the Plaintiff and her clients, who registered their domains under 4Domains. The very fact that ICANN accreditation requires an active commercial insurance policy to cover such damages proves ICANN's knowledge of such risk.

57. In **March 2010** ICANN took no further action to verify whether 4Domains was still compliant with its accreditation contract; when in fact ICANN knew or should have known there was a high probability that 4Domains was no longer compliant. Therefore; ICANN failed to perform reasonable due diligence to assure 4Domains was compliant.

58. In **July 2010** Plaintiff again filed a complaint with ICAAN against 4Domains for failure to perform. ICANN's handling of this second complaint is the cause for breach of contract and breach of warranties; and these breaches ultimately caused the Plaintiff's damages.

59. Between **April and July 2010** the Plaintiff continued to experience problems with 4Domains and evaluated other ICANN accredited registrars with intent to transfer her reseller account and her registered domains.

60. Plaintiff is disabled, and services like 24 hour phone support and 24 hour live chat support better accommodate her disabilities.

61. Plaintiff's disabilities have worsened over the past few years. Software robust enough to allow her to set up sub-accounts for her clients to take more responsibility for managing their own domain names would also better accommodates her disabilities. These features were important in her selection criteria for a new ICANN accredited registrar.

62. In July 2010 Plaintiff contracted as a reseller with another ICANN accredited registrar, Spirit Domains (The Registry at Info Avenue, LLC d/b/a Spirit Telecom) that met all the criteria she deemed essential to accommodate her special needs as a disabled person, and as a disabled very small business owner.

63. Plaintiff started transferring her own and her clients' 73 domain names away from 4Domains to Spirit Domains. 4Domains failed to release Plaintiff's domains to the gaining registrar as required by 4Domains accreditation contract with ICANN.

64. In July and August 2010 Plaintiff filed three complaints with ICANN. However ICANN only has a record of one complaint on or around Aug 21, 2010. This is most likely because ICANN staff combined the three complaints into one in its database retaining the latest date.

65. It should be noted that defendant Charles Steinberger bankruptcy case was filed on August 19, 2010.

66. ICANN had motive to combine Plaintiff's three separate complaints into the one with the latest date to give the appearance that she filed her complaints after the Steinberger bankruptcy was filed. This was not the case.

67. In the Plaintiff's complaints made to ICANN on or about July 21 to Aug 21; and in her numerous phone calls and emails to ICANN between July 2010 and November 2010 she:

   (a.) Provided ICANN with enough information to make an immediate determination that 4Domains was no longer compliant with ICANN accreditation requirements. This information included:

    i.   Phone logs demonstrating that 4Domains phone numbers listed on ICANN's website and elsewhere on the internet resulted in messages that the number was no longer in service;

    ii.   Logs of Google searches Plaintiff performed on the physical addresses for 4Domains provided to ICANN and located elsewhere on the internet. All these addresses proved to be invalid.

    iii.   Logs of Google searches Plaintiff performed on 4Domains CEO and owner, Charles Steinberger that showed he was involved in several questionable and possibly fraudulent business ventures. Charles Steinberger was recorded as an owner of a securities investment company in Florida that went bankrupt. He also was listed as an owner of several other internet related business that all shared the same phone numbers and physical addresses as the ones listed for 4Domains.

    iv.   Google maps and logs of phone calls Plaintiff made to businesses located next door to the known addresses for 4Domains. Plaintiff phoned a dozen such businesses and asked if 4Domains or any of Charles Steinberger's other businesses were located at the addresses provided; or if they ever had been. In every case the answer was "No."

(b.)    Informed ICANN that many of her registered domains were in danger of expiring;

(c.)    Informed ICANN that if these domain names expired it would cause her and to her clients, also very small businesses, and/or non-profit organizations and/or individuals, severe financial damage.

(d.)    Informed ICANN that mass expiration of her registered domain names could result in the failure of her small business and her clients' small businesses.

(e.)   Informed ICANN that stress caused by mass expirations of her and her clients' domain names and fear of serious financial consequences were causing her to experience further health problems.

68.   In fact Plaintiff was bedridden from the end of **August,** through all of **September and October** and part of **November 2010** due to this stress and subsequent health failure caused by this stress.

69.   Instead of expediting its investigation, ICANN staff told the Plaintiff they had to follow its policies to investigate 4Domain's compliance. ICANN staff assured Plaintiff that if 4Domains was found non-compliant her expired domain names would be reinstated.

70.   ICANN took several weeks to investigate whether 4Domains was still compliant. During this time the Plaintiff could neither renew nor transfer her registered domains; they began to expire; and continued to expire until a **total of 21 domain names expired.**

71.   To date ICANN as not reinstated a single domain name lost by Plaintiff and her clients.

72.   Instead, many of Plaintiff's and her clients' domain names have been acquired by their competitors; or worse.

73.   Plaintiff and/or her clients owned their domain names for many years. They invested in the websites these domain names pointed to. These websites enjoyed first page first position in Google, Yahoo and other search engines for many years due to the Plaintiff's website development and ongoing SEO efforts; services for which her client's paid or for which she herself invested.

74.   Plaintiff and her clients invested in advertisements that used the domain names (i.e. addresses for their websites);

75.   Customers and potential customers used these domains to locate these websites and learn more about Plaintiff's business or activities and that of her clients.

76. These domains (i.e. website addresses) now take these customers and/or supporters to websites belonging to competitors and other entities that are now reaping the rewards of the high SEO achieved through Plaintiff's efforts.

77. Plaintiff and her clients lost years of investment in skilled labor; SEO services, advertisements etc due to ICANN's failure to perform its contractual obligations and its implicit and explicit warranties to the Plaintiff and her clients, as a third party registrar of 4Domains; as domain name registrants and as members of the general public.

78. If ICANN had performed due diligence to assure that 4Domains was compliant with its accreditation contract back in **March 2010** when Plaintiff first brought the problems with 4Domains to ICANN's attention, then Plaintiff and her clients would not have suffered any damages.

79. If in **August 2010** ICANN had made a reasonable evaluation of the evidence provided by Plaintiff regarding 4Domains and reviewed its past history of complaints against 4Domains and expedited its investigation of 4Domains compliance, then the Plaintiff and her clients would not have suffered damages.

80. ICANN had multiple opportunities between **August 2010 and November 2010** to act in a way as to prevent the initial damages and further damages to Plaintiff and her clients, but ICANN consistently failed to do so.

81. ICANN displayed a callous lack of concern for the Plaintiff's dilemma caused through no fault of her own; ICANN failed to respond in an appropriate way that would have prevented damages to the Plaintiff and to her clients; and

82. Furthermore, ICANN has demonstrated through its handling of Plaintiff's complaints against 4Domains that the concerns raised by numerous public interest groups regarding ICANN's lack of accountably are valid; these concerns:

---

(a.)    Are well documented throughout the internet;

(b.)    Are voiced by groups affiliated with prestigious Universities and Law Schools including: Harvard and Cornell;

(c.)    Are voiced by professional groups with stated missions to protect public interest specific to very small businesses, non-profit organizations and individuals owning websites and using their personal names as their domain names;

(d.)    Specify that ICANN caters to the concerns of big multi-million dollar corporations and governments (i.e. BIG money) at the expense of small business, non-profit organizations and individuals;

(e.)    Specify that ICANN's lack of accountably to the public is a cause for security concerns.

83.    ICANN does not permit inclusion of public interest groups and groups that specifically represent the interests of small business and non-profit organizations on the internet or the interests of individuals with websites on its Board of Governance Committee.

84.    FURTHERMORE it is highly unlikely that Plaintiff was the only third party registrar and/or registered domain owner who filed complaints against 4Domains for failure to perform prior to its CEO filing bankruptcy.

85.    Plaintiff requested and was denied ICANN's records pertaining to other complaints filed against 4Domains. ICANN's failure to provide the requested information is further addressed in the Plaintiff's CLAIM FOR DAMAGES UNDER THE FREEDOM OF INFORMATION ACT, 5 USC §552 et al

86.    ICANN, as the only authority and monopolized source for domain name registrations, is vested with a public interest responsibility to perform due diligence to assure ongoing compliance of its accredited registrars and to protect public interests on the WWW.

87. In **September and October 2010** Plaintiff asked a selection of ICANN accredited registrars about whether ICANN regularly audited them for compliance. Not one of the registrars she spoke with had ever been audited by ICANN.

88. Plaintiff requested and was denied ICANN's records pertaining to regular compliance audits of ICANN's accredited registrars. ICANN's failure to provide the requested information is further addressed in the Plaintiff's CLAIM FOR DAMAGES UNDER THE FREEDOM OF INFORMATION ACT, 5 USC §552 et al

89. All withstanding, Plaintiff THEREFORE has a right to damages from defendant ICANN pursuant ORS §72.7140, §72.7150, §72.7160 et

90. In the event that damages are unrecoverable from defendants Charles Steinberger and Susan K. Woodard, then defendant ICANN shall be held fully accountable because ICANN had ample opportunity to prevent damages to the Plaintiff and to her clients after defendant Charles Steinberger breached his contractual obligations with ICANN, and after defendant Susan K. Woodard liquidated assets not belonging to defendant Charles Steinberger and BEFORE damages were incurred by Plaintiff and her clients.

91. Furthermore, Plaintiff has a right to include her clients' damages in Plaintiff's claim against ICANN because ICANN's rules have prevented her clients from seeking legal restitution for their own damage from anyone but the Plaintiff.

92. THEREFORE Plaintiff's claim includes damages incurred by her clients as a result of ICANN's breaches.

93. Additionally ICANN's policy regarding domain name disputes is unconstitutional as it has the impact of discriminating against the poor. ICANN's policy requires a $1,500 minimum fee for reach domain name dispute. Under ICANN's policy Plaintiff would be required to pay $31,500 to reclaim the domain names she lost, through no fault of her own, but directly caused by ICANN's failure to

perform and its blatant negligence towards its responsibilities to the public; and is the direct result of

ICANN's desire to unduly enrich itself in lieu of performing its contractual obligations.


### DAMAGES RESULTING FROM FIRST CLAIM

94.   The following list includes domain names owned by Plaintiff and her clients that expired due to

ICANN's breaches of contract and warranty:

(a.)   antiquebusinesses.com
(b.)   americantaxresearch.org
(c.)   automobilebusinesses.com
(d.)   bengalurubusinesses.com
(e.)   bangaloreresidency.com
(f.)   bestsaasprovider.com
(g.)   billsizemore.com
(h.)   ddln-construction-consulting.com
(i.)   expertdbsolutions.com
(j.)   help4chemicalsensitivy.org
(k.)   indiasmallbusinesses.com
(l.)   number1website.com
(m.)   oregonians4honestelections.com
(n.)   oregonians4honestelections.net
(o.)   oregonsmallbusinesses.com
(p.)   ourwebsitedemos.com
(q.)   pms2.com
(r.)   raiseprofits.com
(s.)   unitedstatesbusinesses.com
(t.)   voice4americans.org
(u.)   voice4americans.com

95.   Of these original domain names that expired, the Plaintiff was ultimately able to recover

americantaxresearch.org; bestsaasprovider.com; ddln-construction-consulting.com;

expertdbsolutions.com; help4chemicalsensitivy.org; raiseprofits.com; and voice4americans.org.

96.   However, recovery of the domains names does not constitute recovery of damages caused due to

their expiration and the long-term unavailability of the websites they pointed to on the WWW.

97.   The value of a domain name is not the cost of its registration, but the value of the website the

domain name points to (i.e. is the address for); the search engine positioning achieved for the

domain name through the website's content and through the website developer's SEO activities.

98.   The websites for each of the recovered domain names were unavailable to Plaintiff and to her

clients' customers, potential customers, supporters, subscribers, and other visitors searching for

them online through the WWW for periods of a month or more. This also means no emails could be

delivered through these domains. This unavailability caused damages including but not limited to:

   (a.)   a decline in the websites' SEO positioning;

   (b.)   lost sales and customer or constituent interaction due to undelivered email;

   (c.)   loss of revenue and growth in customer base;

   (d.)   loss of credibility and visitor trust resulting in lower visitor to customer conversion rates.

99.   It will take hours of skilled labor over time to recover these losses. Damages sustained by Plaintiff

and her clients have a long-term affect on their business success.

100.  THEREFORE Plaintiff requests damages for herself and for her clients, who own the above domain

names, in the amount of $20,000/domain, for a total of $120,000 for a the expiration of the domains

and the temporary unavailability of bestsaasprovider.com; ddln-construction-consulting.com;

expertdbsolutions.com; help4chemicalsensitivy.org; raiseprofits.com; and voice4americans.org.

101.  Development costs alone for americantaxresearch.org website exceeded $40,000. This domain name

and its website have belonged to a non-profit client of the Plaintiff, American Tax Research

Foundation since 2006. The website is dynamic (database driven through visitor interaction) with

more than **1000 pages of content**. Prior to the expiration of its domain name, several hundred pages

of this website's content enjoyed first page first position in Google and other search engines for

specific keywords and phrases. Extensive SEO services performed by Plaintiff and paid for by the client will need to be redone.

102. Plaintiff has reports and other documentation created since 2006 for Plaintiff's client specific to this website's development and its SEO performance to substantiate the above facts.

103. Damages include but are not limited to:

    (a.)    lost credibility;

    (b.)    lost visitor activity and reduction of visitor to customer conversions;

    (c.)    lost SEO positioning;

    (d.)    lost advertisement benefit and advertising expenses;

    (e.)    and any other damages due to long-term unavailability of this website.

104. Restitution of $500,000 is requested for the above mentioned damages.

105. FURTUREMORE from the date this complaint is filed an interest rate of 10% shall accrue monthly on any and all unpaid damages.

106. The Plaintiff has for more than seven years personally owned the domain names antiquebusinesses.com; automobilebusinesses.com; bengalurubusinesses.com; indiasmallbusinesses.com; oregonsmallbusinesses.com; and unitedstatesbusinesses.com.

107. These domain names all pointed to niche web portals developed by the Plaintiff. Considerable development investment and SEO effort went into these web portals and they all enjoyed first page, first position in Google, Yahoo and other search engines.

108. A web portal refers to a website that's purpose is to be a starting point for internet users searching for specific information and/or a broad array of resources and services, such as directories, forums, news, weather, online classifieds, localized information, categorized information, phone and map information, and community forums, online auctions and online shopping malls, etc.

109. Companies with portal sites have attracted stock market investor interest because portals are viewed as able to command large audiences that in turn translate to a large number of advertising viewers.

110. Plaintiff's web portals residing on the above mentioned domains included directory listings, display advertisements and other content that brought advertising revenue to her business. These portals were desirable to potential advertisers and the Plaintiff received advertising revenue these portals and received ongoing requests to place paid advertisements on them.

111. As such, these domain names were highly desirable to competitors and were quickly snatched up by them. These domains now point to competitor websites reaping the benefits of Plaintiff's years of skilled labor.

112. Additionally these web portals were to allow Plaintiff to earn income when she was unable to work due to her disabilities. Work she completed on the portals before she became disabled allowed her to earn some income when she became too disabled to work.

113. Plaintiff requests damages of $200,000 for the loss of each of these six domain names for a total of $1,200,000;

114. FURTHERMORE Plaintiff requests that these domain names be reinstated to her. And that from the date this complaint is filed damages in the amount of $15,000 per month/web portal (for a total of $90,000/month) shall accrue for each month the domain names are not reinstated. In addition an interest rate of 10% shall accrue monthly on any and all unpaid damages.

115. The domain name billsizemore.com is the personal legal name of one of her clients who is a well known political activist in Oregon.

116. Bill Sizemore has owned his personal name as the domain names: billsizemore.com, billsizemore.net, billsizemore.org, billsizemore.biz since prior to 2005. His political enemies originally registered these domain names and put up websites with derogatory and slanderous content about him. He won

ownership of these domain names through a domain name dispute filed with ICANN when it was still

a U.S. government regulated monopoly.

117. Plaintiff transferred these domain names into her reseller account with 4Domains on behalf of this

client in 2006. Plaintiff registered additional versions of his personal name as domain names, then

developed a dynamic (database driven through visitor interaction) website for him hosted on the

domain billsizemore.us domain. She then parked his other domain names on this host account.

118. Therefore the client's website is still available, but it cannot be found on the WWW (i.e. internet)

using the domain name "billsizemore.com".

119. Plaintiff's client has incurred substantial damages due to the loss of his billsizemore.com domain

name. This was the domain (i.e. website address) used by his supporters; by the press; in

advertisements; and by search engines to reference or locate his website.

120. This domain name expired on or around September 1, 2010 after which point his website could no

longer be located using the billsizemore.com domain name. This happened in the middle of Oregon's

2010 political season when traffic to his website was at its highest. He received numerous complaints

from his supporters that they could not reach his website. Press conferences, news broadcasts etc all

referenced his website address as billsizemore.com.

121. To date Bill Sizemore's domain name billsizemore.com has not been restored to him. It was

registered in October 2010 by a Japanese merchant through GoDaddy. Currently a website selling

Japanese purses is hosted on this domain. As a result Bill Sizemore has suffered humiliation and a

terrible loss of credibility. No one's personal name should be abused in this manner.

122. This could have just as easily been Oregon Governor Kitzhaber's domain name johnkitzhaber.com

and his website that was affected; or any other Oregon political candidate running for office. ICANN

must held accountable for its lax policies regarding compliance of its accredited registers.

123. Apparently ICANN's procedures changed since it became a privatized monopoly without U.S. government regulation because when Bill Sizemore directly requested ICANN to restore his billsizemore.com in September 2010, unlike his experience with ICANN in 2005, ICANN refused.

124. ICANN and GoDaddy informed him he had to go through his own domain registrar; i.e. Plaintiff. ICANN has continually since **August 2010** refused to reinstate any of Plaintiff's domain names, including billsizemore.com.

125. Considerable evidence exists to substantiate Plaintiff's claims.

126. Bill Sizemore has suffered terrible personal and political damage as a result of the loss of his domain name, in addition to the loss of investment in development and SEO effort made to popularize this domain name for the hundreds of pages of content contained in his dynamic website. This domain name has resulted in first page first position in Google, Yahoo and other search engines since 2006.

127. Plaintiff requests damages in the amount of $500,000 specific to investment in website development and SEO efforts, and including but not limited to advertisement costs, lost visitor traffic, loss of subscriptions and supporter donations; loss of SEO positioning, etc. Additional non-monetary damages are covered in the Plaintiff's second claim.

128. FURTHERMORE Plaintiff requests that the billsizemore.com domain name be reinstated to her in behalf of her client. And that from the date this complaint is filed damages in the amount of $25,000 per month shall accrue for each month the domain name is not reinstated. In addition an interest rate of 10% shall accrue monthly on any and all unpaid damages.

129. The domain name pms2.com is owned by another of Plaintiff's clients. Platinum Management Services is a very small IT staff augmentation company owned and operated by two business partners. This client's business qualifies as a federally designated MBE (Minority Business Enterprise) and as a Women-Owned Small Business (WOSB).

130. This company's domain name was registered in September 2009. Plaintiff developed their website at the same time.

131. Plaintiff requests damages in the amount of $12,000 since SEO was not as well established with this domain as with others that had years of history. This amount is required to redo the website's SEO effort and other internet marketing and advertising efforts.

132. FURTHERMORE Plaintiff requests that the pms2.com domain name be reinstated to her on behalf of her client. And that from the date this complaint is filed damages in the amount of $10,000 per month shall accrue for each month the domain name is not reinstated. In addition an interest rate of 10% shall accrue monthly on any and all unpaid damages.

133. The domain names number1website.com and ourwebsitedemos.com have been registered by Plaintiff since 2006. These domains hosted websites that presented a portfolio of website development projects and provided live demos of Plaintiff's work. The websites located at these two domain names were used to support Plaintiff's marketing efforts. These websites have been unavailable to the Plaintiff's customers and potential customers for more than six months.

134. These two domain names and the websites hosted on them enjoyed first page first position in Google, Yahoo and other search engine results. Due to this they have been snatched by the Plaintiff's competitors who now enjoy the fruit of the Plaintiff's many years of skilled labor.

135. Many hours of skilled labor are required to recover damages caused by the loss of these domain names and the unavailability of the websites they once pointed to.

136. Plaintiff requests damages in the amount of $200,000 for these two domain names.

137. FURTHERMORE Plaintiff requests that these two domain names be reinstated to her. And that from the date this complaint is filed damages in the amount of $40,000/month shall accrue for each

month these two domain names are not reinstated. In addition an interest rate of 10% shall accrue monthly on any and all unpaid damages.

138. In addition to the domain names lost to Plaintiff after Plaintiff filed complaints with ICANN about 4Domains on or about **July 21 to August 21, 2010**; Plaintiff requests damages in the amount of $5,500 for the loss of her customer account with World Banknotes lost due to the defendants' breaches of their contractual obligations in **March 2010**.

139. Plaintiff additionally requests damages in the amount in $40,000 for lost income due her inability to work between **August 2010 and November 2010** due to health problems caused by stress due to ICANN's failure to perform.

140. WHEREFORE Plaintiff prays the court award her a total of **$2,577,500** for damages resulting from Plaintiff's first claim. Plaintiff also prays the court award her **$165,000/month** from the filing date of this complaint for each month the domain names referenced in this complaint are not restored to her; and 10% interest to be accrued monthly on any and all unpaid damages.

## CLAIM FOR INCIDENTAL AND CONSEQUENTIAL DAMAGES UNDER ORS §72.7150 et al.

141. In addition to the above stated monetary damages, Plaintiff and her clients suffered consequential damages that include injury to person and property proximately resulting from defendant ICANN's breach of warranty, as per ORS [1961 c.726 §72.7150].

142. From **August through November 2010** Plaintiff informed ICANN by phone and in writing that she is a disabled person and that the symptoms of her disabilities are severely aggravated by intense and prolonged stress. Plaintiff experienced intense and continued stress caused by ICANN's breach of performance and warranty including but limited to:

(a.)  Loss of 21 domain names through no fault of hers; but through breach of contractual obligations by the defendants.

(b.)  Plaintiff's client's blaming her for their websites becoming unavailable due to their domain names expiring;

(c.)  ICANN's irresponsible and callous handling of Plaintiff's complaints about 4Domains;

(d.)  Loss of income to Plaintiff and her clients caused by aforementioned expired domains and resultant unavailability of the websites they pointed to on the WWW;

(e.)  ICANN's continued and consistent failure to restore Plaintiff's aforementioned lost domains; throughout months of frustrating and unproductive communications with ICANN, including some extremely insulting communications to the Plaintiff from ICANN;

143.  As a result of the above mentioned stress Plaintiff suffered intensified physical pain, loss of memory, cognitive dysfunction, chronic fatigue, headaches and migraines and trouble breathing that was severe enough to cause her to become bedridden for more than three months.

144.  Plaintiff's doctors will provide evidence and testimony as to the effects of this stress on her specific medical conditions and overall health.

145.  Plaintiff incurred medical expenses she does not have the ability to pay during this time; further increasing her stress.

146.  THEREFORE Plaintiff requests damages in the amount of $250,000 for her medical expenses and her pain and suffering.

147.  Plaintiff's business suffered damage to its reputation due to the unavailability of so many of its websites and/or the acquisition of her domain names by competitors.

148.  Plaintiff lost credibility with customers/clients whose domain names expired due to ICANN's breach of its contractual obligations.

149. Plaintiff's failed health caused by the defendants' breaches prevented her from completing work on non-affected client's websites; causing Plaintiff to lose credibility with those clients; and revenue from them.

150. THEREFORE Plaintiff requests $500,000 for these damages.

151. Her clients suffered damage to their businesses' and/or their personal reputations due to the unavailability of their websites and/or the acquisition of their domain names by competitors or worse.

152. THEREFORE Plaintiff requests $2,000,000 in behalf of her clients for these damages.

153. WHEREFORE Plaintiff prays the court award her a total of **$2,750,000** for damages resulting from her second claim. Plaintiff also prays the court award her 10% interest to be accrued monthly on any and all unpaid damages.

154. FURTHERMORE Plaintiff requests that ICANN be made to change its policies so as to better protect public interest and prevent this type of situation from happening in the future to other individuals, small non-profit organizations, very small businesses and third party registrars. ICANN should include in its policies:

    (a.)   Yearly audits of all its accredited registrars to assure ongoing compliance;

    (b.)   Automatic investigations whenever ICANN receives a complaint about one of its accredited registrars indicating the registrar may be insolvent or otherwise non-complaint;

    (c.)   Immediate determination to revoke ICANN accreditation whenever ICANN receives a complaint about one of its accredited registrars; and that registrar is not reachable at the address and phone number in ICANN's records. This means that if ICANN attempts to contact the registrar and:

    i.  The phone number provided to ICANN only reaches an automated voice message and no one returns the voice message for a period beyond 48 hours;

    ii.  The phone number provided to ICANN is non-working;

    iii.  The accredited registrar is not physically located at the address provided to ICANN on its contract or in ICANN's other records;

(d.)  Posting of the results of such audits and investigations on ICANN's website for public access;

(e.)  Posting of proof of commercial insurance by its accredited registrars on ICANN's website for public access to provide a sense of confidence in protection against performance failures;

(f.)  Creation of a written policy regarding transfer of domain registration data and third party registrant accounts away from an insolvent ICANN accredited registrar to another solvent ICANN accredited registrar. Such a policy must include:

    i.  representation by third party registrars at risk for damages;

    ii.  options for accommodating special needs under the ADA and for personal choice when transferring data for third party registrars at risk for damages;

    iii.  posting of such a policy on ICANN's website for public access;

    iv.  periodic re-evaluation of ICANN's policies as needed to assure they protect the interests of third party registrars and prevent damages;

(g.)  Staff training to assure compliance with the ADA and to educate ICANN's staff in how to interact with the disabled in ways that are courteous and non-condescending.

## CLAIM FOR DAMAGES UNDER THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. §12182 et al.

155. On **September 21, 2010** defendant ICANN sent the Plaintiff an email stating they had determined 4Domains Inc. was in a bankruptcy. There were no instructions for how plaintiff could recover her expired domains or prevent more domains from expiring.

156. ICANN transferred 4Domains data and reseller accounts to defendant Internet.bs, another ICANN accredited registrar and on **October 5, 2010** the Plaintiff received an email from defendant Internet.bs prompting her to login into her account control panel to manage her domains.

157. When Plaintiff logged into her Internet.bs account none of her registered domains showed up. The data transfer had not been done correctly.

158. Eventually ICANN and Internet.bs corrected this problem; however this was not before more of Plaintiff's domains expired.

159. Plaintiff experienced ongoing problems with Internet.bs. In particular with email communications. Because Plaintiff's health prevented her from checking her email often; emails between defendant Internet.bs and Plaintiff kept passing each other. This caused considerable miscommunication.

160. This situation became extremely stressful for Plaintiff, so she requested phone support to resolve these miscommunication problems. Internet.bs staff refused to provide phone support stating it was not Internet.bs' policy.

161. Plaintiff explained to Internet.bs about the nature of her disabilities and that she had become bedridden and had only enough energy to check emails every couple days. Plaintiff again requested phone support in light of this information but Internet.bs continued refusal to provide it.

162. Several email replies from Internet.bs to Plaintiff were rude and condescending towards her.

163. Finally out of total frustration Plaintiff requested in writing that Internet.bs make a change in its policy and provide her with phone support as a reasonable accommodation to her disabilities under 42 U.S.C. §12182. Again Internet.bs refused.

164. Plaintiff had already established a new reseller account with another ICANN accredited registrar that did offer 24/7 phone support. Plaintiff stated in her complaint to ICANN about 4Domains that she